**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Norman Dean GRIFFITH,**
**Defendant-Appellant.**

**No. 75–1441.**

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1976.

Decided July 1, 1976.

Conrad L. Kellenberg, Denise Smith, Law Student, Notre Dame, Ind., for defendant-appellant; Mary Mullaney, Law Student, Notre Dame, Ind., on the brief.

John R. Wilks, U. S. Atty., Fort Wayne, Ind., John S. Leonardo, Asst. U. S. Atty., South Bend, Ind., for plaintiff-appellee.

Before SWYGERT, PELL and TONE, Circuit Judges.

TONE, Circuit Judge.

In this appeal from a conviction for possessing a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, defendant raises a single issue, *viz.,* whether the search of his motel room at the time of his arrest violated his Fourth Amendment rights. We reverse the judgment on the authority of *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

After an evidentiary hearing on defendant's motion to suppress, the District Court denied the motion. The facts, as found by the District Court and as further shown by the evidence, viewed in the light most favorable to the government, are as follows:

On the evening of September 20, 1974, Officer Michael Bolin of the Indiana State Police and Special Agent David Munson of the Federal Drug Enforcement Administration, both operating under cover, went with an informer [1] to the Eight-Day Inn Motel in

---

1. The informer, Donald Vandygriff, was also named as a codefendant in this case. Earlier that day Bolin had purchased 50,000 amphetamine tablets from Vandygriff and then arrested him, following which more amphetamine tablets were found. After the arrest Vandygriff told Bolin that his source of supply, who proved to be defendant, was in town from Cali-

St. Joseph County, Indiana. While Munson waited, Bolin and the informer proceeded to room 261, which was occupied by defendant. Upon entering, the informer introduced Bolin to defendant as the person who had purchased a large quantity of amphetamine tablets from the informer earlier in the day. Bolin then negotiated with defendant for the purchase of more tablets, which defendant said he had with him. Arrangements were made to complete the transaction later that evening.

The room contained two beds with a night stand between them and other furniture. On one of the beds was an open suitcase, in which some clothes and two brown paper sacks were visible. Bolin did not see the contents of the sacks. On the other bed was a case three feet long, one foot wide, and three inches thick, which Bolin thought might contain a weapon. On the night stand between the beds was a clear plastic bag containing a green leafy substance which was never further identified. Bolin did not see any amphetamines or money.

Bolin did not arrest the defendant at this meeting, because, the District Court found, "of concern for his own personal safety as well as wanting to call the United States Attorney and also get more money." Bolin and the informer left, apparently with the understanding that they would return later that evening.

About one hour later Bolin, Munson, and four other state officers returned to the motel. They had neither an arrest warrant nor a search warrant. Munson, the District Court, found, had talked by telephone with an Assistant United States Attorney "about obtaining a search warrant and he was unable to locate a local Magistrate or Federal Judge."[2] The officers obtained a pass key from the night clerk, advising him, as the court found, that they were going to make an arrest and they wanted the pass key "to avoid damaging the door . . . and to minimize the risk to the people." They then went to room 261 and, without knock or announcement, opened the door with the pass key.

As the officers opened the door and entered the room defendant was "just exiting the bathroom" in his undershorts.[3] Agent Munson immediately told defendant he was under arrest. Defendant offered no resistance and did not comport himself in a threatening manner or give any indication of an intent to flee. Munson testified that he walked over to defendant, "took hold of him" and "placed him up against the wall and told him to place his hands up against the wall where [Munson] could see them." Munson then advised defendant of his rights and that he was being taken into custody and instructed him to get dressed. Defendant thereupon proceeded to dress. He was not handcuffed and was allowed to move about the room to pick up clothing as he dressed.

Visible in the room at the time the officers entered it were a suitcase lying on one of the beds and a brown paper sack lying next to it. This was one of the two paper sacks Bolin had seen earlier that evening. After Agent Munson placed defendant under arrest, Officer Bolin went over to the

---

fornia and agreed to cooperate with Bolin and Munson.

**2.** Munson's testimony about this conversation was as follows:

"Q . . . And what was the essence of that conversation with Mr. Kieser?

"A I explained to him the circumstances of Mr. Bolin's meeting with the defendant, Dean Griffith; and requested some advice from him as to what action we could take.

"Q Did he indicate whether there were any of the judicial officers available to have facts presented to them for the issuance of an arrest or search warrant?

"A Well, earlier in the day we had attempted to find the local Magistrate and he was not available. This was following the arrest of Mr. Vandygriff. As I recall, at that time, we also attempted to locate a Judge—Federal Judge here in South Bend and were unable to do that also. So I knew this already at the time I was calling Mr. Kieser."

**3.** Most of the facts relating to the search have been drawn from the transcript, since the District Court's memorandum of decision is addressed primarily to the circumstances surrounding the arrest. See text at note 4, *infra*.

bed and looked into the sack, which was open, and saw that it held glassine bags containing white tablets. One officer searched the bathroom and found $5,410 in currency concealed in a towel. The officers also opened the suitcase and found a second brown paper sack containing pills. They gathered defendant's belongings together, in the process of which they found a small quantity of hashish and the glassine bag containing a green leafy substance referred to earlier. They packed all of defendant's belongings, checked him out of the motel room, and took him to the police station.

In his oral argument in support of his motion to suppress the items seized in the search, trial counsel for defendant focused his argument on the legality of the arrest and did not argue that even if the arrest was lawful the search was unreasonable under *Chimel v. California, supra.*[4] Presumably for this reason, the District Court's memorandum of decision supporting the denial of the motion was addressed only to the lawfulness of the arrest. Defendant's counsel on appeal assumes the validity of the arrest and argues that the search was nevertheless unlawful. We likewise assume, without deciding, that the arrest was valid.[5]

The extent of the officers' right to make a warrantless search incident to the arrest is governed by *Chimel v. California, supra,* in which, at 395 U.S. at 763, 89 S.Ct. at 2040, the Court laid down the following principles:

> "[I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

> "There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant."

 The search of the bathroom, a "room other than that in which [the] arrest occur[red]" (395 U.S. at 763, 89 S.Ct. at 2040), was forbidden by *Chimel,* as was the search of the closed suitcase and other "closed or concealed areas in that room itself." (*id.*). This leaves the brown paper sack lying on the bed next to the suitcase. The contents were not subject to seizure under the plain-view doctrine even though the sack was "open," since Officer's Bolin's inspection was not inadvertent. See *Coolidge v. New Hampshire,* 403 U.S. 443, 469–470, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion of Stewart, J.); *Dombrowski v. Cady,* 471 F.2d 280, 285–286 (7th Cir. 1972), *rev'd on other grounds,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Bolin could see the contents only after walking over to the bed and peering into the sack. Whether this conduct was incident to the arrest depends on whether the

---

**4.** The motion to suppress itself alleges that the search was unconstitutional. The *Chimel* argument was made for the first time in a memorandum in support of defendant's motion to reconsider the ruling on the motion to suppress.

**5.** Compare *Ker v. California,* 374 U.S. 23, 38–41, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (plurality opinion of Clark, J.), with *Jones v. United States,* 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); see also *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385, 388–394 (1970); *United States ex rel. Wright v. Woods,* 432 F.2d 1143, 1145–1146 (7th Cir. 1970), *cert. denied,* 401 U.S. 966, 91 S.Ct. 983, 28 L.Ed.2d 248 (1971).

sack was in "the area from within which [defendant] might gain possession of a weapon or destructible evidence" *Id.* We think it was not. Immediately upon entering the room Agent Munson immobilized defendant. When Officer Bolin walked over to the bed, defendant, clad only in his undershorts, was either leaning on his hands against the wall or had been recently released from that position by Agent Munson.[6] Thus at that time the sack lying on the bed either was not within the area of defendant's immediate control or was within that area only because the officers had deliberately chosen to allow defendant to move near the sack.

 Once a suspect is under the control of arresting officers, the area of permissible search under *Chimel* is narrowed accordingly. *United States v. Mapp,* 476 F.2d 67, 79–80 (2d Cir. 1973); *United States v. Shye,* 473 F.2d 1061, 1066 (6th Cir. 1973). In neither *Mapp* nor *Shye* does it appear that the suspect was handcuffed. While, in other cases, courts have distinguished between the situation in which the suspect is handcuffed and those in which he is not, *United States v. Weaklem,* 517 F.2d 70, 72–73 (9th Cir. 1975); *United States v. Patterson,* 447 F.2d 424, 427 (10th Cir. 1971), *cert. denied,* 404 U.S. 1064, 92 S.Ct. 748, 30 L.Ed.2d 752 (1972), the reason underlying the limited right of search allowed in *Chimel* is the danger that the defendant will seize a weapon or destructible evidence, and whether that danger exists depends upon the circumstances of each case. Regardless of Officer Bolin's earlier apprehensions about the odd-shaped case that might contain a gun, the officers obviously did not believe defendant was likely to resist, escape, or destroy evidence after he had been placed under arrest. They did not handcuff him, and they allowed him to walk about the room to get dressed instead of bringing his clothes to him.

 If the freedom thus permitted defendant created the danger that he would walk within reach of the brown paper sack—and the record does not even show that it did—the danger was of the officers' own making. Just as "*Chimel* does not permit the arresting officers to lead the accused from place to place and use his presence in each location to justify a 'search incident to the arrest,'" see *United States v. Mason,* 173 U.S.App.D.C. 173, 177, 523 F.2d 1122, 1126 (1975), it does not permit the officers to achieve the same result by ordering the accused to dress and then not bringing him his clothes, thus requiring him to move about the room in order to comply with their directions. The officers' only legitimate purpose in being in the room was to make an arrest. They did not have the right to create a situation which gave them a pretext for searching beyond the area of defendant's immediate control. The officers could have handed him whatever clothes he needed in order to dress. They could then have posted a guard on the room, obtained a search warrant, and later returned to search the room pursuant to the warrant. *Cf. United States v. Jeffers,* 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *United States v. Hayes,* 518 F.2d 675, 677–678 (6th Cir. 1975). They could not, however, make a warrantless search of the bedroom and the bathroom without violating the strictures of *Chimel.*

Neither party has cited *United States v. Mason, supra,* 523 F.2d 1122, a decision by a divided panel of the District of Columbia Circuit which tends to support the government's position more than any other case we have found. While we think Judge Bazelon's dissent in that case persuasive, we do note that the case is distinguishable on its facts: Unlike defendant in our case, who was merely following the officers' directions, the defendant there was the prime mover in taking the arresting agents to a closet which they would not otherwise have

---

**6.** The inference must be drawn from the following testimony by Agent Munson:

"Q When you arrested him, did the other officers begin to search the premises?

"A No, sir.
"Q Did Agent Bolin go to any bags?
"A Oh, I—yeah, he went over and looked in that bag. Yes, sir."

searched and where they inadvertently discovered an illegal firearm. They discovered it not in making a search, as in the case at bar, but in making preparations to allow the defendant to reach into the closet to select an article of clothing which he wished to wear. The agents made no search at all, according to their testimony, but discovered the firearm incidentally, when one of them felt it as he moved a suitcase. If the weapon had been in plain view when they opened the closet door at the defendant's request, they could have seized it, and the same result should arguably obtain when they inadvertently felt the weapon while they were not engaged in a search. The majority, we recognize, chose to treat the case as if a search had occurred and held that the defendant brought the interior of the closet within the area of his immediate control for *Chimel* purposes when he moved near the open closet door. See 523 F.2d at 1126 and n. 6. But this was because "it was [the defendant] who led the officers to the closet" and requested access to it, and he therefore had "no basis to object that the arresting officers conducted a protective search to secure the area prior to granting his request." *Id.* The court recognized, in the language quoted earlier in this opinion, that *Chimel* does not permit the arresting officers to expand the searchable area by leading the defendant from place to place. In the case at bar, the officers, by the direction given to defendant and their conduct, caused defendant to move from place to place in the room.

■ The government suggests that it was proper for the officers to gather together defendant's belongings and take them to the police station, inventorying them in the process, just as if he had been arrested on the street with those belongings in his possession. This presupposes that for purposes of the application of the Fourth Amendment the motel room is not to be viewed as a dwelling. The Supreme Court has held otherwise. *Stoner v. California,*

376 U.S. 483, 488–490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Jeffers, supra,* 342 U.S. at 51–52, 72 S.Ct. 93; *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The officers had no greater right to remove or search defendant's personal belongings that were not on his person or within his immediate control than they would have if they had made the arrest in his house.

■ A different rule applies when the arrest is made away from the arrestee's permanent or temporary dwelling. It is then reasonable for the officers to take custody of the personal property in the arrestee's possession at the time of his arrest. A warrantless search of such property may be made incident to and at the time and place of the arrest, *Draper v. United States,* 358 U.S. 307, 314, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Eatherton,* 519 F.2d 603, 609–611 (1st Cir.), *cert. denied* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975), or later at the place of detention, see *United States v. Edwards,* 415 U.S. 800, 807, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. Battle,* 166 U.S.App.D.C. 396, 510 F.2d 776, 778 (1975); see also *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (automobile). When, however, the arrest is made in the arrestee's dwelling, the *Chimel* rule governs.

Because we conclude that it was error to deny the motion to suppress, the judgment must be reversed and the case remanded for a new trial.