UNITED STATES of America, Plaintiff,

v.

Donald Kennedy MAJORS, Defendant.

No. 76 CR 777.

United States District Court,
N. D. Illinois, E. D.

March 17, 1978.

Prior to trial, Majors moved to suppress evidence that was taken from him when he was arrested in a motel room in Matteson, Illinois. The motion was heard, a memorandum of the court's findings of fact and conclusions of law was filed, and suppression of the evidence was denied. Three days before these rulings, *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), was decided by the Supreme Court. In the light of this decision, Majors has moved the court to reconsider its ruling on his motion to suppress; and in addition, contends that on the authority of *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and *United States v. Griffith*, 537 F.2d 900 (7th Cir. 1976), this court should set aside its prior ruling and suppress the evidence taken from him at the time of his arrest. The motion to reconsider has been granted; and the court has reviewed the record before it in order to determine whether *Chadwick* applies to this case; and whether *Chimel* and *Griffith* mandate a grant of the motion to suppress as Majors insists. This reconsideration requires a restatement of the facts shown by the evidence.

Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for plaintiff.

Mildred G. Peters, Northfield, Ill., for defendant.

## MEMORANDUM

LEIGHTON, District Judge.

This is a prosecution by a nine-count indictment that charges Donald Kennedy Majors with illegal possession of unregistered, unnumbered destructive devices, and with unlawfully transporting them after having been convicted of a felony. It is charged that these offenses violate the United States Code, three sections of one title and two of another.[1] The devices, as described in the nine counts, were a sawed-off repeating rifle, silencer, hand grenade, and a derringer with its serial number obliterated.

### I.

On June 25, 1975, Majors was indicted by a federal grand jury in Des Moines, Iowa for a violation of the Dyer Act. A warrant for his arrest was issued. Attempts were made to take him into custody, without success. Two weeks later, in the company of two young women, Barbara Thompson and Rama Jo Grayson, he registered under an assumed name in the Matteson Motel, Matteson, Illinois. Among the items in his possession was an attache case to which the women had access, with his permission.

On the night of July 8, 1975, the case contained a sawed-off repeating rifle, silencer, hand grenade, and some rounds of .22 long ammunition. The two women knew the location of these items. Late that night, Majors told Grayson that the next

---

1. Title 18, United States Code, §§ 842(i), 922(g), 922(k), and Title 26, §§ 5861(d) and 5861(i).

morning a man from Crete, Illinois was going to meet them in the motel; and he wanted her and Thompson to help him kill the man and take from him credit cards and other valuables. Grayson refused to partake in such a project. Majors threatened her. Then, on a pretense, Grayson telephoned her mother in San Francisco, California, told her of defendant's murder plan, and asked that she call the San Francisco office of the Federal Bureau of Investigation and tell them. Her mother agreed to do so. Grayson then communicated directly with the Chicago FBI office, identified herself to the duty agent, told him where she was, and gave the information that a man with her named Don Majors was planning to commit a murder the next morning. She asked for assistance. She told the agent about the weapons defendant had in the attache case. Grayson was told to wait in the motel for an FBI agent.

A short time later, Special Agent Ernie L. Waldrup arrived at the motel. He met Rama Jo Grayson, spoke with her, and obtained a description of Majors that coincided with that which he had been given by the FBI duty agent in Chicago. Grayson told Waldrup about the contents of the attache case. She said they were a sawed-off pistol, a hand grenade which Majors ". . . had gotten . . . from a kid in Sacramento and . . . was live . . . ., and quite a few rounds of .22 longs." She told Waldrup that the attache case was at the foot of the motel room bed in which Majors was sleeping with Thompson.

At the time Waldrup spoke with Grayson, he knew that Majors was wanted for the Dyer Act violation in Des Moines, Iowa; and that a warrant was outstanding for his arrest. Waldrup had learned from FBI agents in Chicago that the man described to him was wanted, was armed and considered dangerous. Grayson had told him of Majors' plan to commit a murder the following morning. She described the motel room she and Thompson were sharing with Majors, its lighting condition, the location of the attache case, and said that she had left the door open so that the room could be entered.

After consulting with his superiors, Waldrup and two other agents entered the room at about 1:50 a. m., awoke Majors who was in bed nude, ordered him to put on some clothes, and handcuffed him. He was asked by Waldrup about the attache case. Majors responded by pointing to the foot of the bed. At no time was he closer than five feet from the case. Waldrup seized it, opened it, and took possession of its contents. Another agent questioned Thompson. She was advised of her constitutional rights. The agent asked her if she had a purse. She said she did. She was told by one agent that she could refuse permission to search her purse. Nonetheless, she agreed to a search of it. An agent looked into the purse and saw a derringer. When asked about its owner, she said the weapon belonged to Majors who acknowledged that this was true. Thereafter, Majors was taken from the motel room in handcuffs. Waldrup took with him the attache case and its contents which the government intends to use as evidence in this prosecution, and Majors contends should be suppressed.

## II.

■ Majors' reliance on *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), is based on the fact that a footlocker was seized at the time of the arrest in that case and later searched by federal agents without a warrant, a search the Supreme Court said infringed the Fourth Amendment. *Chadwick* was decided on June 21, 1977; Majors was arrested on July 8, 1975 and his attache case was searched by federal agents without a warrant. It is now established that *Chadwick* is not retroactive. *United States v. Montgomery*, 558 F.2d 311 (5th Cir. 1977); *United States v. Reda*, 563 F.2d 510 (2d Cir. 1977). In *United States v. Berry*, 571 F.2d 2 (7th Cir. 1978), on rehearing, it was decided that *Chadwick* is not to be applied retroactively in this circuit. 571 F.2d at 3. Therefore, this court cannot, in the light of that decision, reconsider a ruling that predated it.

In addition to this reliance on *Chadwick*, Majors argues that under *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), a search incident to a valid arrest is governed by the necessity to disarm the individual arrested for protection of arresting officers, and prevent the destruction of evidence. He points out that in his case, he was arrested while nude and immediately handcuffed. Therefore, he presented no danger to those arresting him; nor was there any likelihood that he could destroy the contents of the attache case since he was effectively restrained and never was closer to it than five feet. For these reasons, Majors insists that Special Agent Waldrup, and those with him who entered the motel room, should have done what Judge Tone said in *United States v. Griffith*, 537 F.2d 900 (7th Cir. 1976): "they [the officers] could then have posted a guard on the room, obtained a search warrant; and later returned to search the room pursuant to the warrant." 537 F.2d at 904.

However, it appears to this court that the facts in *Griffith* about which Judge Tone was speaking were quite different from those in the case at bar. The officers in *Griffith* were not confronted with the exigency that faced Agent Waldrup and the officers with him. Before entering the motel room to make the arrest and seizure in question, Waldrup was told by Rama Jo Grayson that Majors had possession of an attache case which contained dangerous explosives, including a live hand grenade. Law enforcement officers who arrest dangerously armed persons are not held to meticulously precise conduct in taking steps to protect themselves from attack and injury. Moreover, they are obliged to take steps that will minimize existing dangers where explosives are in the possession of those taken into custody.

In *United States v. Berry*, 571 F.2d at 3, the court speaking by Judge Bauer, said that ". . . until *Chadwick* there was no reason for law enforcement officials to believe that attache cases were not among those personal effects which, under *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), could be seized as part of a 'full search of the person' incident to a lawful arrest, and which, under *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), could be searched several hours after the suspect had been taken into custody." Judge Bauer went on to point out that based on *Robinson* and *Edwards*, courts of appeals have held, prior to *Chadwick*, that law enforcement officers could seize a briefcase or package in the possession of a person at the time of arrest, and subsequently search the property without a warrant. *United States v. Schleis*, 543 F.2d 59 (8th Cir. 1976) *vacated and remanded*, 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977); *United States v. Battle*, 166 U.S.App.D.C. 396, 510 F.2d 776 (1975); *see also, United States ex rel. Muhammed v. Mancusi*, 432 F.2d 1046 (2d Cir. 1970), *cert. denied*, 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971). The fact that the arrested person is handcuffed and later, a suitcase, briefcase, or attache case is searched, would not lead to a different conclusion. *See United States v. Mehciz*, 437 F.2d 145 (9th Cir.), *cert. denied*, 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971); *United States v. Johnson*, 467 F.2d 630 (2d Cir. 1972), *cert. denied*, 413 U.S. 920, 93 S.Ct. 3069, 37 L.Ed.2d 1042 (1973); *United States v. Frick*, 490 F.2d 666 (5th Cir. 1973), *cert. denied*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974); *United States v. Kaye*, 492 F.2d 744 (6th Cir. 1974); *United States v. Eatherton*, 519 F.2d 603 (1st Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975); *United States v. French*, 545 F.2d 1021 (5th Cir. 1977); *compare State v. Cox*, 294 Minn. 252, 200 N.W.2d 305 (1972).

These authorities persuade this court that it reached the correct constitutional result when, in denying the motion to suppress it concluded that the situation faced by Special Agent Waldrup and those with him ". . . was one fraught with exigency." Majors was armed and dangerous. The attache case and its contents were a source of danger to the arresting officers, defendant, his companion in the room, and others. As this court stated in one of its conclusions of

law, "It would have been a species of folly under the circumstances known to the agents, for them to have applied for a warrant before they seized the attache case, opened, and inspected its contents." For these reasons, the court will adhere to its earlier ruling. The motion to suppress is denied.