**UNITED STATES of America, Plaintiff,**

v.

**Leon WALKER, Defendant.**

**No. 85 CR 797.**

United States District Court,
N.D. Illinois, E.D.

Nov. 10, 1987.

Stephen Heinze, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

James Holloway, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

On December 10, 1985, four Calumet Park police officers went to the home of defendant Leon Walker armed with a $50,-000 bail bond forfeiture warrant from Peoria County. In the process of executing the warrant, the officers entered Walker's home and seized hundreds of articles of allegedly stolen mail. Later that day, the officers obtained Walker's consent to search his home for a mailbox key. During this search, the officers seized a few more articles of mail but did not discover the key. On April 30, 1986, Walker was indicted on charges of possessing stolen mail in violation of 18 U.S.C. § 1708 and related bank fraud offenses, 18 U.S.C. §§ 1344, 2, and 1029(a)(2) and (b)(1).

Walker subsequently moved to suppress the mail seized on the morning of December 10[1] on the grounds that the seizure violated the Fourth Amendment. Pursuant to § 28 U.S.C. 636(b)(1)(B), this court referred the motion to Magistrate Bernard Weisberg. The magistrate held an evidentiary hearing on July 14 and 28, 1986. On February 27, 1987, the magistrate issued a comprehensive and thoughtful Report and Recommendation Regarding the Motion to Suppress ("R & R") in which he recommended that the motion to suppress be granted.

1. For the status of the mail seized during the afternoon search, see *infra,* at p. 9 n. 2.

On March 9, 1987 the Government filed with this court objections to the magistrate's report ("Gov."), as provided by 28 U.S.C. § 636(b)(1)(C). It argued that the seizure of the mail did not violate the Fourth amendment and that, even if it did, the inevitable discovery doctrine of *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), makes suppression of the evidence improper. For the reasons set forth below, reasons which differ from those set forth by the magistrate, this court holds that the search did violate the Fourth amendment and, further, that the inevitable discovery doctrine does not apply. Accordingly, defendant's motion to suppress must be granted.

### FACTS

Although the parties presented very different versions of the events that transpired on December 10, many facts are not in dispute. Four Calumet police officers— Officers Nagle and Wright and Investigators Wiessner and Radwan—arrived at Walker's home some time between 10:30 and 11:30 a.m. They had with them a $50,000 bail bond forfeiture warrant from Peoria County. The underlying charge was possession and manufacture of a controlled substance.

In the weeks prior to December 10, the police had been on the lookout for Walker's wife. They suspected her involvement in the robbery of numerous postal boxes in the vicinity of the Walker home. They wanted to bring her in for questioning, but they did not believe they had probable cause for her arrest or to search her home. Thus, on the morning of December 10, they arrived at the Walker residence armed only with a warrant for Walker's arrest.

Before executing the warrant, the officers checked to see if Mrs. Walker's car was there. It was. Nagle, Wiessner, and Radwan went to the front door; Wright went to the back of the house. When Nagle knocked, Walker opened the door and allowed the officers to enter. All agree that Walker was calm and cooperative. At this point, however, the stories diverge.

### 1. *Police Version*

According to the police, Nagle immediately read Walker his *Miranda* rights. While he was doing so, the officers noticed two stacks of letters on a shelf to their right. Each stack contained between 10 and 30 letters, and the officers could see that the envelopes on the top of the stacks were not addressed to Walker or to the Walker address.

The police further testified that Walker was clad in pajama bottoms and a tee shirt and that, after reading Walker his rights, Nagle ordered Walker to get dressed. Nagle also asked Walker if there was anyone else in the house, and Walker responded that his wife and nephew were sleeping in bedrooms at the back of the house. Walker then turned and headed for his bedroom; the three officers followed.

On their way to the bedroom, the men passed through the living room and into the kitchen, where the officers spotted between sixty and eighty additional articles of mail on the counter and kitchen table. Radwan stayed in the kitchen, Nagle accompanied Walker to his bedroom where his wife was sleeping, and Wiessner went to the adjoining bedroom where Walker's nephew slept. Wiessner awakened the nephew, told him to get dressed and proceeded to the Walker bedroom.

In the bedroom, Nagle and Wiessner observed hundreds of articles of mail scattered on the floor, dresser and bed. They also saw three large briefcases. Two were open and filled with mail; the other was closed.

Nagle asked Walker if he knew whose mail it was. Walker said that he did not, and Nagle asked him if the police could take it. Walker agreed, and the police began collecting the mail. While they were doing so, Officer Wiessner spotted on the dresser a bank statement addressed to a friend of his who lives a block from the Walker house.

The officers mixed the mail from the open suitcases with the mail lying about the room. They also opened the closed

suitcase and mixed the contents with the other mail. They did not search any other closed drawers or cabinets. The mail was taken to the kitchen, where Officer Radwan was collecting the mail from the rest of the house. The officers placed all of the mail in two of the suitcases found in Walker's bedroom.

Walker dressed in his bedroom; his wife went into the bathroom across the hall. After they were dressed, the police brought them and their nephew into the kitchen and finished collecting the mail. Nagle spoke by phone with Sargeant Theis of the Calumet Police Department, who instructed him to bring all three individuals and the mail to the police station. About 30 minutes passed from the time the police first knocked at the door to the time they left the Walker residence.

At the police station, the officers asked Walker if he would give written consent to a further search of his home. He did, and later that afternoon he returned to his home with Postal Inspector Ligon, Sargeant Theis, and Officers Wiessner and Radwan.

The primary object of the search was a mail box key. The search lasted about forty-five minutes, during which time the officers opened drawers and cabinets, and searched the basement and attic. They did not find the key, but they did seize a few more items of mail.

### 2. Walker Version

Walker's version of the events of December 10 differed from that of the police in a few important respects. According to Walker, he was dressed in pants and a shirt when he answered the door that morning. Nagle entered first, and remained with him, but the other two officers immediately headed for the back of the house. Walker soon followed, and when he saw the officers entering the bedroom where his wife slept, he broke past them and asked them to stop so he could awaken her.

Walker also testified that the police conducted a thorough search of his house that morning. They opened drawers and cabinets, searched the bedroom closet and went through the attic and basement. The afternoon search, on the other hand, was short and uneventful, lasting only 10 to 15 minutes.

### THE MAGISTRATE'S RECOMMENDATIONS

In his recommendations, Magistrate Weisberg accepted the officers' testimony that Walker had permitted the officers to enter his home, and that while in the front hallway they observed numerous items of mail in stacks in the living room. He did not, however, decide which version of the events preceeding the officers' sweep through the house was more accurate. "[I]t makes no difference whether Walker asked to go to the bedroom to talk to his wife or the police directed him there to dress. In either case the police could lawfully accompany him." R & R at 10. Moreover, "a protective sweep of the house to locate others justified the police presence in the kitchen and in the wife's bedroom." R & R at 11. Because the initial entry and sweep through the house were lawful, the magistrate reasoned, the seizure of the mail scattered throughout the house was justified under the "plain view" exception to the warrant requirement. R & R at 9–13, citing, Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Nevertheless, the magistrate recommended that this court suppress all of the mail seized during the morning search. For he believed that the officers did violate the Warrant Clause when they opened the closed briefcase located in the Walker bedroom, and contaminated the rest of the mail by mixing it with the mail found in briefcase. Although he agreed with the government that suppression would not be required if the government could find a way of identifying which items were lawfully seized, he did not believe the government could do so here. The magistrate did not discuss the bank statement allegedly viewed by Officer Wiessner on the dresser in the Walker bedroom.

## DISCUSSION

### Standard of Review

In reviewing the magistrate's recommendations, this court's function differs markedly from that of an appellate court. When a motion to suppress evidence in a criminal case is referred to a magistrate for preliminary disposition, the Federal Magistrate Act, 28 U.S.C. 636(b)(1)(B), "require[s] the District Court to make a *de novo* determination of *any disputed portion* of the Magistrate's proposed findings and recommendations." *United States v. Raddatz*, 447 U.S. 667, 672, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980) (emphasis added). In making its determination, the district court need not hold another evidentiary hearing. It must, however, "give fresh consideration to those issues to which specific objection has been made by a party." *Id.* at 675, 100 S.Ct. at 2412, *quoting* H.R. Rep. No. 94–1609, p. 2 (1976).

### Review of the Magistrate's Recommendations

In its Objections to the Magistrate's Report and Recommendations, the government claims that the magistrate made factual errors in his report which require rejection of the magistrate's recommendations. First, the items in the closed suitcase did not include any articles of mail and, therefore, did not contaminate the mail lawfully seized throughout the house. Second, even if lawfully and unlawfully seized mail was commingled, at least one piece of lawfully seized mail can be specifically identified as such—the letter to Officer Wiessner's friend which the officer spotted before the commingling occurred.

Assuming for the moment that the magistrate was correct in finding the officers' entry into and passage through the house lawful, "fresh consideration" of the above issues would require this court to partially reject the magistrate's recommendation. Although the testimony supports his determination that mail was unlawfully seized from the closed briefcase and then commingled with mail discovered throughout the house, this commingling did not contaminate all of the mail.

■ When the government commingles lawfully and unlawfully seized evidence, all of the evidence must be suppressed unless the government can identify specific items which were lawfully seized. *United States v. Finucan*, 708 F.2d 838, 844–45 (1st Cir. 1983). Here, the government has identified one piece of mail which could not have come from the closed briefcase. Officer Wiessner testified that, upon entering the Walker bedroom, he saw a letter addressed to his friend on the dresser. The magistrate did not indicate that he doubted the veracity of this testimony, and this court finds it to be entirely credible. The magistrate erred when he failed to differentiate this item of mail from the rest.

Thus, were this court limiting its review to those issues contested by the government, it would suppress all of the mail seized at the Walker home, with the exception of the letter identified by Officer Wiessner. The inquiry does not, however, end here. For this court's careful review of the magistrate's recommendations and the record below indicates that there exists another reason for suppressing a large amount of the mail seized from the Walker home, including the letter identified by Officer Wiessner.[2]

### The Warrantless Search of the Walker Home

When Magistrate Weisberg found that the police had lawfully seized the mail they located during their warrantless passage through the house and into the Walker bedroom, he did so pursuant to the "plain view" exception to the warrant requirement. For that doctrine to apply, the magistrate had to determine that the officers' passage through the house was itself law-

---

2. The following discussion does not address the mail viewed by the police from the front hallway. Walker concedes that he allowed the police to enter his home when he answered the door. Thus, the officers' presence in the front hallway was lawful, and they properly seized the mail which they could readily ascertain was not addressed to the Walkers. *Arizona v. Hicks*, —— U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). Were it not for the commingling problem, these letters would be admissible.

ful. *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971) (seizure of evidence in "plain view" is justified "[w]here the initial intrusion that brings the police within plain view of such [evidence] is supported ... by one of the recognized exceptions to the warrant requirement"); *accord Illinois v. Andreas,* 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983); *Arizona v. Hicks,* —— U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

In making this determination, the magistrate did not resolve the conflict in the testimony over the officers' reasons for proceeding through the house to the Walker bedroom. Instead, he determined that, irrespective of whose testimony he believed, two separate exceptions to the warrant requirement could justify the officers' passage through, and presence in, the rest of the house—the "protective sweep" and the "integrity of the arrest" doctrines.

### 1. *The Protective Sweep*

The Supreme Court has never explicitly countenanced the warrantless search of a residence at the time an arrest warrant is executed "to guard against the chance that third parties may offer resistance." La-Fave, *Search and Seizure* § 6.4(c) (2d ed. 1987). However, the principle of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that police may take reasonable action to ensure their safety, justifies such "protective sweeps" in appropriate circumstances.

Although courts have not set forth with precision the ground rules for "protective sweeps," a few things are clear. First, the police must "reasonably perceive an immediate danger to their safety." *United States v. Owens,* 782 F.2d 146, 151 (10th Cir.1986). *See also United States v. Jones,* 696 F.2d 479 (7th Cir.), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983). Second, the search must be carefully limited "to a quick and cursory viewing to check for other persons who might present a security risk." *United States v. Owens,* 782 F.2d 146, 151 (10th Cir.1986). *See generally* LaFave, *Search and Seizure* § 6.4(c) (2d ed. 1987). Finally, because

"protective sweeps" represent exceptions to the warrant requirement, the government bears the burden of establishing their legitimacy. *United States v. Patino,* 830 F.2d 1413, 1415 (7th Cir.1987). *See also United States v. Salgado,* 807 F.2d 603, 609–10 (7th Cir.1986) ("Courts take a very hard line against the search of a person's home without a warrant ..., and therefore demand a genuine showing of emergency before they excuse the failure of police to get a warrant.").

■ Even assuming the accuracy of the officers' testimony regarding the sweep through the Walker residence, the government has utterly failed to meet its burden in this case. Nowhere do the officers indicate that they perceived a danger from others in the household, nor did they present any facts to support an inference that such a danger existed. Moreover, the sweep went far beyond a "quick and cursory viewing to check for other[s]." Thus, the "protective sweep" doctrine cannot justify the officers' passage through the house and, therefore, cannot support the seizure of items observed in "plain view" at that time.

### 2. *Protecting the Integrity of the Arrest*

In *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1983), the Supreme Court held that when an arrestee wishes to proceed somewhere while in custody, the police may accompany him even if he has a reasonable expectation of privacy in that place. Although the Court in *Chrisman* did not specifically discuss "consent," it is clear that the Court's decision depended on the voluntary nature of the arrestee's movements. *See id.* at 7 n. 4, 102 S.Ct. at 817 n. 4.

■ In this case, however, Magistrate Weisberg concluded that the officers could accompany Walker throughout his house "whether Walker asked to go to the bedroom to talk to his wife or the police directed him there to dress." R & R at 10. The magistrate thus read the Supreme Court's decision too broadly. If Walker did not wish to proceed to the other rooms of his

house, the police could not "lead [him] from place to place and use his presence in each location to justify [their presence there]." *United States v. Griffith,* 537 F.2d 900, 904 (7th Cir.1976); *accord United States v. Hill,* 730 F.2d 1163, 1167 (8th Cir.) *cert. denied,* 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984); *United States v. Mason,* 523 F.2d 1122, 1126 (D.C.Cir.1975).

Thus, it becomes necessary for this court to resolve a factual question not reached by the magistrate—that is, whether Walker voluntarily proceeded to his bedroom or was compelled to go there by the police. Although the magistrate suggested that Walker voluntarily headed for his bedroom in order to warn his wife of the officers' presence in the house, R & R at 10, this court's review of the testimony indicates that Walker only proceeded to the bedroom after the police ordered him there to dress.[3]

Accordingly, *Chrisman* does not justify the officers' passage through the house, and the seizure of mail by the police during their passage through and presence in the Walker home violated the Fourth Amendment.

### The Inevitable Discovery Doctrine

In a final effort to rescue the evidence, the government has presented this court with an argument not raised with the magistrate. The government now contends that, even if the morning search did violate the Fourth Amendment, this court should find the evidence seized during the search to be admissible under the "inevitable discovery" doctrine, recently approved by the Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

In *Nix,* the police had violated the defendant's Sixth Amendment rights by improperly persuading him to confess to the murder of a young girl after he had refused to speak without counsel present. During his confession, the defendant revealed the location of the girl's body. The officers proceeded to the place described by the defendant, and found the body.

The Supreme Court held that, although discovery of the body was a fruit of the poisonous tree—the coerced confession—it was nonetheless admissible. For at the same time that the police were questioning the defendant and using his information to locate the body, an independent search party was proceeding towards the place where the body was located. Had the interrogating officers not arrived first, the search party would ultimately or inevitably have discovered the body.

Thus, in *Nix,* the Supreme Court established an exception to the exclusionary rule. When the government obtains evidence through a constitutional violation, this evidence need not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. at 2509.

There is an ambiguity, however, in the Supreme Court's statement of this rule. When the Court requires that the evidence "ultimately or inevitably would have been discovered by lawful means," does it mean that it ultimately or inevitably would have been discovered even if no government misconduct had occurred? Or, alternatively, does it mean that the evidence ultimately or inevitably would have been lawfully discovered had the evidence not already been seized?

Courts employing the "inevitable discovery" doctrine since *Nix* have all assumed the former meaning. They have thus required the prosecution to prove that the police would have obtained the evidence even if the misconduct had not occurred—that there exists no "but for" connection between the police misconduct and the sub-

---

3. Indeed, the government has expressly, if unintentionally, conceded this point. *See* Government's Post Hearing Response to Defendant's Motion to Suppress Evidence, at 1–2 ("Because defendant was wearing pajama pants and an undershirt, Officer Nagle told him to get dressed. Defendant then turned and began to walk towards the back room of the house."), *citing* Tr. at 193 (testimony of Officer Wiessner):

Q: Did Mr. Walker say anything abut getting dressed, or was he told to get dressed?
A: Officer Nagle told him he should get dressed.

sequent search. *See United States v. Salgado*, 807 F.2d 603, 608 (7th Cir.1986); *United States v. Silvestri*, 787 F.2d 736 (1st Cir.1986). *See also United States v. Satterfield*, 743 F.2d 827, 845–46 (11th Cir.) (requiring that "the lawful means which made discovery inevitable were possessed by police and were being actively pursued *prior to* the occurrence of the illegal conduct") (emphasis in original), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1984); *accord United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir.1985), *cert. denied*, —— U.S. ——, 107 S.Ct. 932, 93 L.Ed.2d 983 (1986).

Yet, one could plausibly argue that where the initial illegal seizure is sufficiently attenuated from the subsequent justification for another search, the "inevitable discovery" doctrine should apply notwithstanding a causal connection between the two. Under this approach, the government must prove the following:

1) that it had a lawful basis for a subsequent search;

2) that, had the evidence not already been seized, it inevitably would have been discovered during that search; and

3) that the basis for the subsequent search was "come at ... by means sufficiently distinguishable [from the original police misconduct] to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), *quoting*, J. Maguire, *Evidence of Guilt* 221 (1959).

The government would not, however, have to prove that the basis for the subsequent search was "wholly independent of any constitutional violation." [4] *Nix v. Williams*, 467 U.S. at 443, 104 S.Ct. at 2508 (analogizing "inevitable discovery" rule to "independent source" doctrine).

To be sure, this application of the inevitable discovery doctrine could "put [the prosecution] in a better position than it would have been in if no illegality had transpired." *Nix v. Williams*, 467 U.S. at 443, 104 S.Ct. at 2508. But that is always the case when "fruit of the poisonous tree" analysis mandates the admissibility of evidence despite its causal connection to government misconduct. *See generally* LaFave, *4 Search and Seizure* § 11.4(a) (2d 1987).

In this case, the government argues that the evidence it unlawfully seized during the morning search should not be suppressed because the officers would have discovered the evidence during the search they conducted later that day. The search was a lawful consent search; the officers would inevitably have discovered the mail during the search; and Walker's consent was an intervening factor sufficient to purge the taint of the morning misconduct. The government insists that the causal connection between the earlier seizure and Walker's consent is not determinative.

■ The government's argument is not without force. Because Walker voluntarily consented to the afternoon search, any evidence actually seized during that search was sufficiently attenuated from the earlier illegality so as to render it admissible.[5] *See* LaFave, *3 Search and Seizure* § 8.2(d) at 194–96 (2d ed. 1987); Note, Illegally Acquired Information, Consent Searches, and Tainted Fruit, 87 *Col.L.Rev.* 842, 856–

---

**4.** Although *Nix* held that independence of the primary illegality from the subsequent search was sufficient for the doctrine to apply, the Court did not state that such independence was necessary for its application. Circuit courts applying and elaborating *Nix* have required total independence of the illegality from the justification for the subsequent search, on the grounds that such independence is necessary to ensure that the subsequent search was "inevitable." *See, e.g., United States v. Cherry*, 759 F.2d 1196, 1204–05 (5th Cir.1985), —— U.S. ——, 107 S.Ct. 932, 93 L.Ed.2d 983 (1986). However, as noted above, the language of *Nix* itself does not make

clear that the lawful *search* must have been inevitable. If the Court meant only that *seizure* would have been inevitable during a subsequent lawful search, then the circuit courts' basis for requiring total independence would disappear.

**5.** This analysis should not be construed as a binding determination that evidence seized during the afternoon search of Walker's home is admissible. The parties have not addressed that evidence in their briefs, and the discussion here is purely hypothetical.

58 (1987). The government merely asks that evidence which would have been discovered that afternoon, had it not already been seized that morning, be held admissible as well. Nevertheless, this court has concluded that it must reject the extension of the inevitable discovery doctrine which the government now seeks.

The Supreme Court has stated that exceptions to the exclusionary rule may be appropriate where their detrimental impact on the rule's deterrent function is minimal. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Nix v. Williams*, 467 U.S. at 443, 104 S.Ct. at 2508. The facts of this case clearly demonstrate that combining the inevitable discovery doctrine of *Nix* with the attenuation doctrine of *Wong Sun* and progeny would seriously undermine the deterrent function of the exclusionary rule. If the police may seize evidence unlawfully, use it to obtain consent for a subsequent search, and then introduce it on the grounds that they would inevitably have seized it during that search, they will have nothing to lose and much to gain from an unconstitutional search where they lack the grounds for a constitutional one.[6] *See* Note, 74 Colum.L.Rev. 88, 99 (1974); Comment, 115 U.Pa.L.Rev. 1136, 1143 (1967). *Compare United States v. Miller*, 666 F.2d 991 (5th Cir.) (inevitable discovery doctrine rendered witnesses' testimony admissible where, although defendant's illegally seized diary led police to the witnesses, his confession, which would inevitably have led the police to the witnesses, was given at the time of the seizure and was causally unrelated to it), *cert. denied*, 456 U.S. 964, 102 S.Ct. 2043, 72 L.Ed.2d 489 (1982).

Accordingly, this court holds that, where the police obtain consent for the search of a place they have already searched, the inevitable discovery doctrine will not apply unless the government can establish that the consent was wholly independent—i.e.,

the consenting party did not know—of the unlawful search. Here, the government cannot satisfy this burden.

## CONCLUSION

The evidence seized during the morning search of the Walker home is suppressed.

---

6. There is a fundamental difference, of course, between the potential for abuse under this proposed extension of the inevitable doctrine and that presented by the *Wong Sun* attenuation doctrine. Whereas both doctrines allow the police to use unlawfully seized evidence to obtain consent for a lawful search, the attenuation doctrine leaves the evidence actually seized during the unlawful search inadmissible. Thus, the police have much to lose from unlawful searches and remain deterred from conducting them.