Tanicka SMITH,[1] Appellant–Respondent,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 71A03–0802–CR–43.

Court of Appeals of Indiana.

July 8, 2008.

---

1. The record consistently identifies the defendant as "Tamicka Smith," but we note she signed her name as "Tanicka Smith" to a letter that was introduced into evidence at trial. We will therefore use the latter spelling, but apologize to Smith in advance if our spelling is incorrect.

Thomas P. Keller, South Bend, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ian McLean, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary and Issue

Following a bench trial, Tanicka Smith appeals her conviction of possession of cocaine, a Class D felony. On appeal, Smith raises one issue, which we restate as whether the trial court properly admitted into evidence cocaine that was found fol-

lowing a search of the motel room in which Smith was an occupant. Concluding that the search was unreasonable and that the trial court therefore improperly admitted the cocaine into evidence, we reverse and remand.

### Facts and Procedural History

On October 26, 2006, Corporal Neil Hoover of the St. Joseph County Police Department received information that Smith was staying at a motel in St. Joseph County and that there was a warrant for her arrest. Around 7:00 p.m. that evening, Corporal Hoover arrived at the motel with Lieutenant Craig Toner and Patrolman Kevin Kwieran, both of the Roseland Police Department. Corporal Hoover knocked on the door to Smith's room while identifying himself as a police officer. After Corporal Hoover knocked several times without receiving a response, the three officers heard "some rustling, possibly whispering in the room" followed by "a very distinct sound that appeared to be porcelain-on-porcelain" that, according to Corporal Hoover, "sounded like a toilet lid being knocked around." Transcript at 12. Based on these observations, the officers believed that the occupants might be hiding weapons or contraband, or, according to Corporal Hoover, "possibly making a plan of attack for [the] officers when they enter the room." *Id.* at 15. Corporal Hoover and Lieutenant Toner also based their beliefs as to the occupants' actions on past experiences at the motel, as both testified that they had responded to calls at the motel on many occasions and that several of those calls resulted in the discovery of hidden weapons and contraband.

After Corporal Hoover knocked several more times, someone inside the room asked whether the officers had a warrant. Corporal Hoover said he did, and the person kept telling the officers, "Just a minute, just a minute." *Id.* at 14. In response, Corporal Hoover got a keycard from the front desk and announced, "We have a card, we're going to open the door." *Id.* at 15. After two unsuccessful attempts by Corporal Hoover to open the door, a man, later identified as Thomas Hardy, opened the door and let the officers inside. The officers entered with weapons drawn; Lieutenant Toner secured Hardy,[2] while Corporal Hoover and Patrolman Kwieran opened the door to the bathroom. Smith was standing between the doorway and the toilet in her underwear, and Patrolman Kwieran directed her out of the bathroom and had her lay on the bed that was closest to the bathroom. After Smith had exited the bathroom, Corporal Hoover entered and "began like a wingspan search of whatever [Smith] could have touched at the time when we found her." Tr. at 18. This search included looking inside a makeup bag that was near the sink and removing the lid to the toilet's tank. Inside the tank, Corporal Hoover discovered a plastic baggie containing .26 grams of cocaine.

After discovering the cocaine, Corporal Hoover attempted to confirm Smith's identity, but she gave a false name. One of the officers opened a handbag that was on the nightstand, discovered a driver's license, and confirmed Smith's identity. The officers then permitted Smith to get

---

**2.** The evidence is conflicting as to how Hardy was secured. Corporal Hoover testified that Lieutenant Toner handcuffed Hardy and stood next to him, Lieutenant Toner testified that he did not handcuff Hardy and placed him on the bed that was farthest from the bathroom (there were two beds in the room), and Patrolman Kwieran testified Lieutenant Toner handcuffed Hardy while he was lying face-down on the bed. Nevertheless, we describe Hardy as being "secured" because this description is consistent with the trial court's finding. *See* Appellant's Appendix at 11 (describing Hardy as being "secured").

dressed and handcuffed her. Also around this time, according to Patrolman Kwieran, either Corporal Hoover or Lieutenant Toner "searched like around the beds, opened the drawers, a couple of drawers" and found a pipe underneath the air conditioner. *Id.* at 68.

On October 28, 2006, the State charged Smith with possession of cocaine, a Class D felony. On June 25, 2007, Smith filed a motion to suppress the cocaine. On June 28, 2007, the trial court conducted a hearing on the motion to suppress, but deferred ruling on the motion until after a bench trial. On the same day, the trial court conducted a bench trial, during which it heard testimony from Corporal Hoover, Lieutenant Toner, and Patrolman Kwieran. On July 24, 2007, the trial court entered an order denying Smith's motion to suppress and finding her guilty of possession of cocaine. Smith now appeals.

## Discussion and Decision

### I. Standard of Review

In cases such as this one where Smith originally sought to suppress evidence, but appeals following its admission, we choose to frame the issue "as whether the trial court abused its discretion by admitting the evidence at trial," *Washington v. State,* 784 N.E.2d 584, 587 (Ind.Ct.App.2003), because "[o]ur standard of review for rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pretrial motion to suppress or by an objection at trial," *Cole v. State,* 878 N.E.2d 882, 885 (Ind.Ct.App.2007). Abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Smith v. State,* 754 N.E.2d 502, 504 (Ind.

2001). In making this determination, we do not reweigh evidence and consider conflicting evidence in a light most favorable to the trial court's ruling. *Cole,* 878 N.E.2d at 885. We also consider uncontroverted evidence in the defendant's favor. *Id.*

### II. Reasonableness of Search

Smith argues the trial court abused its discretion in admitting the cocaine into evidence because it was the product of an unreasonable search and therefore violated her right to be free from such searches as guaranteed by the Fourth Amendment.[3] The Fourth Amendment states in relevant part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The purpose of this provision is to protect people from unreasonable search and seizure, and it applies to the states through the Fourteenth Amendment. *Krise v. State,* 746 N.E.2d 957, 961 (Ind.2001) (citing *Mapp v. Ohio,* 367 U.S. 643, 650, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)).

We note initially the parties agree that the officers' entry into the room and arrest of Smith was valid and that Corporal Hoover's removal of the toilet lid constitutes a warrantless search for Fourth Amendment purposes. Thus, the question becomes whether Corporal Hoover's warrantless search was reasonable. "The Fourth Amendment requires the police to obtain a search warrant from a neutral, detached magistrate prior to undertaking a search of either a person or private property, except under special circumstances fitting within 'certain carefully drawn and well-delineated exceptions.'" *Sellmer v. State,* 842 N.E.2d 358, 362 (Ind.

---

**3.** Smith purports to argue that the search also violated Article I, Section 11 of the Indiana Constitution, but has waived this argument because she has not provided analysis that is distinct from her Fourth Amendment argument. *See Hannibal v. State,* 804 N.E.2d 206, 209 n. 5 (Ind.Ct.App.2004), *trans. denied.*

2006) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Because warrantless searches are per se unreasonable, the State bears the burden of establishing that the search falls within one of the well-delineated exceptions to the warrant requirement. *Johnson v. State,* 766 N.E.2d 426, 432 (Ind.Ct. App.2002), *trans. denied.* We will discuss several of these exceptions, but, for reasons explained below, conclude that none of them apply so as to render Corporal Hoover's search reasonable.

## A. Consent

■ In concluding that Corporal Hoover's search was reasonable, the trial court appears to have relied at least in part on Hardy's consent, as it found "that the officers were voluntarily allowed into the hotel room by an occupant of that hotel room...." Appellant's App. at 12. A voluntary and knowing consent to search is a well-recognized exception to the warrant requirement. *Krise,* 746 N.E.2d at 961. However, where consent to search has been given, the resulting search is reasonable only if it is within the scope of that consent. *Pinkney v. State,* 742 N.E.2d 956, 960 (Ind.Ct.App.2001), *trans. denied.* "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness, in other words, 'what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *Id.* (quoting *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

The record indicates that after Hardy opened the door and let the officers in, no further communication took place regarding whether Hardy or Smith would consent to a search of the premises. Instead, Corporal Hoover entered the bathroom after Smith had exited and began his search.

Even assuming that Hardy's act of opening the door and letting the officers in constituted consent to enter, no reasonable person could have interpreted this to mean that the officers also had consent to search the premises. *Cf. Buckley v. State,* 797 N.E.2d 845, 849–51 (Ind.Ct.App.2003) (concluding officer's removal of the lid to a small tin exceeded the scope of consent where the officer asked the defendant if he could search the house to see if anyone else was present and the defendant replied that the officers could "go ahead and check ... anything [they] want[ed]"). Thus, it follows that Corporal Hoover did not have consent from Hardy or Smith to search the toilet.

## B. Protective Sweep

■ The State's principal argument is that Corporal Hoover's search of the toilet was reasonable because it was part of a "protective sweep" of the premises. *See* Appellee's Brief at 6 ("Because of the proximity of access from the beds to the bathroom, Officer Hoover would have been justified in conducting his brief sweep of the room even without the reasonable suspicion created by the occupants' behavior." (citing *Hannibal,* 804 N.E.2d at 209)). Although we agree with the State that Corporal Hoover was justified in conducting a protective sweep of the bathroom, the scope of that sweep was limited to areas from which a person could have immediately launched an attack. *Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *see also State v. Estep,* 753 N.E.2d 22, 26 (Ind.Ct.App.2001) ("[A] protective sweep is authorized under *Buie* either of rooms immediately adjoining the place of the arrest (without need for officer suspicion), or of areas that might, given facts articulable by the searching officer, contain a hiding person who might jeopardize officers['] safety."). Because a toilet tank is not an area from which a person could launch an attack, it

follows that the protective sweep exception does not apply to Corporal Hoover's search.

## C. Search Incident to Lawful Arrest

■ The State also appears to argue in part that Corporal Hoover's search was reasonable because it was confined "only to areas that would have been within Smith's reach from where she was standing inside the bathroom...." Appellee's Br. at 6. This argument is consistent with Corporal Hoover's testimony that when he entered the bathroom, he "began like a wingspan search of whatever [Smith] could have touched at the time when we found her." Tr. at 18. In *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court explained the permissible scope of a search incident to a lawful arrest and why such a search is constitutionally reasonable:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"— construing that phrase to mean the area from within which he might gain posses-

sion of a weapon or destructible evidence.

The corollary to these observations is that a search incident to a lawful arrest is unreasonable where the reasons for its justification—promoting officer safety and preventing destruction of evidence—cannot be vindicated. *See id.* at 764, 89 S.Ct. 2034 ("The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest.") (quoting *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964)).

Seizing on this point, Smith appears to argue that Corporal Hoover's search of the toilet was unreasonable because it occurred after Smith had been removed from the bathroom and placed on a bed. The trial court also acknowledged that there was a spatial and temporal gap between Smith's removal from the bathroom and Corporal Hoover's search, as it found that "[a]fter officers had secured not only [Hardy], but also the defendant, they looked into the bathroom area, more specifically the toilet, and found cocaine...." Appellant's App. at 11. However, that Corporal Hoover conducted his search after Hardy and Smith had been secured in another room does not automatically render the search unreasonable. *See Rush v. State*, 881 N.E.2d 46, 50 (Ind.Ct.App.2008) (explaining that "[t]he 'touchstone of the Fourth Amendment is reasonableness,' and reasonableness is measured in objective terms by examining the totality of the circumstances" (quoting *Ohio v. Robinette*,

519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996))). To resolve that question, we turn to several cases that have addressed the issue under circumstances that are factually similar to this case.

In *United States v. Queen,* 847 F.2d 346, 348–50 (7th Cir.1988), three federal agents went to the defendant's home to execute a bench warrant that had been issued for his arrest. When the agents arrived, they saw a man inside the home, but he did not respond when the agents knocked on the door and identified themselves. After entering the home with the assistance of the defendant's stepson, one of the agents found the defendant hiding underneath a blanket in a basement closet. The agent twice instructed the defendant to show his hands. The defendant exposed only one hand, and eventually exposed the other hand after the agent instructed him to do so several more times. By that time, the other two agents had arrived in the basement, and they patted the defendant down and handcuffed him in an area approximately three feet, from the closet. The agent who had discovered the defendant then returned to the closet and found a handgun lying in plain view on the floor. The court concluded that the agent's act of returning to the closet and finding the handgun was a valid search incident to a lawful arrest because the agents knew that the defendant "had carried a handgun in the past and that he might be armed and dangerous," *id.* at 353, the defendant was reluctant to comply with the agent's instructions, and the discovery of the handgun occurred immediately after the arrest and at a time when the defendant, though handcuffed, was nevertheless only three feet away from the weapon, *see id.* On this latter point, the court appeared to acknowledge that although the risk of the defendant grabbing the weapon was slight, a contrary ruling would amount to "second-guess[ing] the agents' on-the-scene determination" in a situation where they "reasonably could have feared for their safety." *Id.* at 354.

The result in *Queen* was similar to an earlier decision from that circuit. In *United States v. Fleming,* 677 F.2d 602, 605 (7th Cir.1982), a police officer was monitoring Fleming's home on suspicion of drug trafficking when the officer observed a co-defendant, Rolenc, approach Fleming's home carrying a brown paper bag. When Fleming opened the door holding another brown paper bag, the officer ran to the door and arrested Rolenc, while two other officers followed and arrested Fleming. During the arrests, both Fleming and Rolenc dropped their bags; one of the officers who arrested Fleming opened Fleming's bag during the arrest and discovered cocaine, while the officer who arrested Rolenc opened Rolenc's bag (containing $10,000 in cash) after transporting him to the street and handcuffing him. The court concluded that the officers' acts of opening the bags were valid searches incident to lawful arrests. Regarding the search of Rolenc's bag, the court reasoned that handcuffing Rolenc and transporting him to the street before the search occurred did not render it unreasonable because a contrary rule would "impose on police a requirement that the search be absolutely contemporaneous with the arrest, no matter what the peril to themselves or to bystanders." *Id.* at 608.

In contrast to the decisions in *Queen* and *Fleming,* in *Ceroni v. State,* 559 N.E.2d 372, 374 (Ind.Ct.App.1990), *trans. denied,* a panel of this court concluded that the search of a hotel room following the arrest of several individuals "clearly fell outside the exception delineated in *Chimel.*" In *Ceroni,* five police officers were dispatched to a hotel room in pursuit of an individual. When the defendant answered the door, the officers believed a man

standing behind the defendant met the individual's description. The officers entered the room and, once inside, observed some marijuana in plain view on a table. Several of the officers contained the defendant and the three other occupants while one or two other officers searched the premises. Inside a drawer, an officer recovered a satchel that contained drug paraphernalia and 56.8 grams of cocaine. In concluding that the search was invalid, the court noted that all four of the occupants were confined to the center of the room by three or four police officers and that the occupants were six to eight feet from the drawer where the satchel was discovered. The court also rejected that the search was initiated to protect the officers, characterizing the purported concern for officer safety as a "pretext for conducting a search for narcotics" because at least one of the occupants was not patted down at the scene, and a subsequent search at the police station revealed he was carrying a knife. *Id.* at 375.

Similarly, in *United States v. Griffith*, 537 F.2d 900, 902 (7th Cir.1976), a police officer and a federal agent went to the defendant's hotel room to conduct an undercover drug purchase. Once inside, the officer observed two brown paper sacks in an open suitcase on one of the beds and a smaller case on the other bed. The purchase did not occur at that time, in part because the officer was concerned the smaller case might contain a weapon. The officer and the agent returned an hour later accompanied by four other officers, and this time they entered the room without knocking or announcing their presence. As they entered, the defendant exited the bathroom in his underwear, and the agent told the defendant he was under arrest. The defendant did not resist, and the agent approached the defendant, placed him against the wall, and told him to put his hands above his head. The agent then

explained that the defendant was being taken into custody and instructed him to get dressed. While the agent was dealing with the defendant, several of the officers searched the bathroom and the cases that had been seen earlier and recovered drugs and cash. The court concluded that the search "was forbidden by *Chimel*" because it was not designed to protect the officers: "the officers obviously did not believe defendant was likely to resist, escape, or destroy evidence after he had been placed under arrest. They did not handcuff him, and they allowed him to walk about the room to get dressed instead of bringing his clothes to him." *Id.* at 904.

Here, to the extent Corporal Hoover's search of the toilet was designed to promote officer safety, it is closer to the searches in *Ceroni* and *Griffith* than it is to the searches in *Queen* and *Fleming*. Although the officers understandably became concerned for their safety when they heard furtive movements and the occupants were reluctant to let them in the room, that concern was eased after Hardy was secured and Smith was placed on the bed. Corporal Hoover testified that Smith complied when he instructed her to exit the bathroom, that Smith was not handcuffed while she was on the bed "because at the time we didn't feel there was an immediate threat, due to what she was wearing," tr. at 32, and that Smith was permitted to dress before she was handcuffed, *cf. Queen*, 847 F.2d at 353 (reasoning that officer safety was a significant concern because "the agents were aware that [the defendant] had carried a handgun in the past and that he might be armed and dangerous. Moreover, when the agents found him in the basement hiding underneath a blanket, [the defendant] stuck out only one hand; the other appeared only after several commands to

stick out both hands, palm-up, into the open"); *Griffith*, 537 F.2d at 904 (reasoning that officer safety was not a significant concern because instead of handcuffing the defendant, the officers "allowed him to walk about the room to get dressed instead of bringing his clothes to him").

The officers did perceive Hardy as a threat, but he had already been secured at the bed farthest from the bathroom at the time of the search. Although we recognize this does not foreclose that Hardy may have attempted an escape or other drastic action, *see United States v. Abdul–Saboor*, 85 F.3d 664, 670 (D.C.Cir.1996) ("*Chimel* does not require the police to presume that an arrestee is wholly rational. Persons under stress may attempt actions which are unlikely to succeed." (citation omitted)), we cannot uphold the search as consistent with *Chimel* based on the risk that Hardy might have attempted to move past three officers, enter the bathroom, remove the toilet's lid, and obtain a weapon or destroy the cocaine before the officers subdued him, *cf. Ceroni*, 559 N.E.2d at 375 (rejecting the State's argument "that one of the captives could have lunged six to eight feet, opened the desk drawer, removed the satchel, reached into the satchel, and recovered a weapon or destroyed evidence before being apprehended by the five armed police officers in the room"); *see also United States v. Mapp*, 476 F.2d 67, 80 (2d Cir.1973) (noting that a valid *Chimel* search cannot assume the arrestee is "an acrobat or a Houdini").

Nor are we convinced that the search was valid under *Chimel* because it was designed to prevent the destruction of evidence. All three officers testified that when they heard the distinct, porcelain-on-porcelain sound, they thought the occupants might be hiding evidence, not destroying it. *See* tr. at 15 ("Q: And those thoughts, plus the sound of porcelain that you heard, what did that make you think? [Corporal Hoover]: They might have bee[n] hiding weapons, obtaining weapons, we didn't know at the time."); *id.* at 39 ("[Lieutenant Toner]: The first thing we noticed was that the bathroom was shut. And that became a bit of a concern, just by virtue of what we heard from standing outside of the room prior to entering, and that was that porcelain-on-porcelain sound. Something was being hidden, we thought."); *id.* at 52 ("[Patrolman Kwieran]: We didn't know if they were going to be hiding contraband, weapons, drugs, anything that could harm us at that point, just an officer's safety issue."). The scope of the officers' searches also indicate the searches were designed to uncover hidden evidence, not to prevent its destruction. Corporal Hoover testified that his search included looking in a makeup bag, and Patrolman Kwieran testified that after Corporal Hoover finished searching the bathroom, one of the officers "searched like around the beds, opened the drawers, a couple of drawers" and found a pipe underneath the air conditioner. *Id.* at 68. Had the officers heard the porcelain-on-porcelain sound and believed that the occupants were attempting to destroy evidence, we would think they would have limited their search to the toilet, which provides the most expedient means to accomplish such a goal.[4] *See People v. Elliot*, 314

---

4. The dissent characterizes our analysis as improperly relying on the officers' subjective belief that the occupants were hiding evidence. *See* Dissent, Op. at 18. We emphasize that it is the scope of the resulting search, and not the officers' subjective belief, that supports our conclusion that the officers' search was unreasonable. Stated differently, we agree with the dissent that a reasonable officer could have inferred from the porcelain sound that the occupants were using the toilet tank to destroy evidence, but their resulting search should have been limited to that area. The dissent's quote from the *Robinette* deci-

Ill.App.3d 187, 247 Ill.Dec. 314, 732 N.E.2d 30, 37 (2000) (recognizing "it is common knowledge that, in the face of a police drug raid, occupants will attempt to flush illegal drugs down the toilet") (Bowman, J., dissenting), *appeal denied.*

*Chimel* instructs that a search incident to a lawful arrest is reasonable only to the extent it can be characterized as promoting officer safety or preventing the destruction of evidence. *See* 395 U.S. at 764, 89 S.Ct. 2034. As the foregoing establishes, the officers' search cannot be viewed as vindicating either of these justifications. *Cf. Ceroni,* 559 N.E.2d at 375 ("Here, the police officers need only have removed the arrestees from the hotel room and obtained a warrant to search the remainder of the room, if they felt that there was probable cause to believe that narcotics were present in the room. Although the procedure may seem a mere formality to those whose everyday job is to obtain them, the failure to obtain a warrant in the absence of exigent circumstances is inexcusable." (citation omitted)). Accordingly, we conclude that the search of the toilet tank violated the Fourth Amendment and that the trial court necessarily abused its discretion when it admitted the cocaine recovered from that search into evidence.

### Conclusion

The trial court improperly admitted the cocaine into evidence because it was the product of an unreasonable search.

Reversed and remanded.

RILEY, J., concurs.

BAKER, C.J., dissents with opinion.

sion confirms this point. *See id.* 18–19 ("[T]he subjective intentions of an officer ' do[ ] not invalidate the action taken as long as the circumstances, viewed objectively, jus-

BAKER, Chief Judge, dissenting.

I respectfully dissent. As noted by the majority, a search pursuant to *Chimel* is valid if it is justified by the need to seize weapons and other things which might be used to assault an officer . . ., as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. *Chimel v. California,* 395 U.S. 752, 764, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Taking a step back, it is well established that the "touchstone of the Fourth Amendment is reasonableness," and reasonableness is measured in *objective* terms by examining the totality of the circumstances. *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

The majority concludes that the search was not designed to prevent the destruction of evidence because the officers testified that when they "heard the distinct, porcelain-on-porcelain sound, they thought the occupants might be hiding evidence, not destroying it." Op. at 14. As noted above, however, the applicable standard is objective. Therefore, the subjective intentions of an officer " 'do[ ] not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' " *Robinette,* 519 U.S. at 38, 117 S.Ct. 417 (quoting *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

Here, all three officers testified explicitly and consistently that before they entered the room, they heard a "very distinct sound that appeared to be porcelain-on-porcelain, which in [the officers'] experience sounded like a toilet lid being

tify that action.' " (quoting *Robinette,* 519 U.S. at 38, 117 S.Ct. 417 (quoting *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)))).

knocked around." Tr. p. 12. I believe that as an objective matter, a reasonable officer could have inferred from this sound that one of the occupants of the hotel room was attempting to destroy evidence—specifically, drugs—by dumping it into the toilet tank. Because the circumstances, viewed objectively, justify the officers' actions pursuant to *Chimel,* their subjective intentions and concerns do not invalidate the search. Thus, I believe that the search did not violate the Fourth Amendment and would affirm the trial court's admission of the evidence.