## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 10 2016, 8:20 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Charles W. Lahey
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Charles Alexander,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | November 10, 2016<br><br>Court of Appeals Case No.<br>71A03-1601-CR-78<br><br>Appeal from the St. Joseph Superior Court<br><br>The Honorable Elizabeth C. Hurley, Judge<br><br>Trial Court Cause No.<br>71D08-1409-F3-7 |

**Baker, Judge.**

[1] Charles Alexander appeals his conviction for Attempted Robbery,[1] a Level 3 Felony. Alexander argues that the trial court erred when it allowed the State to impeach him on his prior offenses and that it committed fundamental error by not disqualifying three jurors. Finding no error, fundamental or otherwise, we affirm.

## Facts

[2] On September 13, 2014, Sean Diggins and Paul Smith were barbecuing and watching football at Diggins's house. They were planning to use pay-per-view to watch a fight on television later that night. Diggins's two daughters, ages eight and five years old, were at his house.

[3] At some point during the evening, Alexander called Diggins and asked what he was doing. Diggins said that he was going to order the fight. Alexander said that he was going to come over around 10:30 p.m. Around 10:30 p.m., there was a knock at Diggins's back door, and Diggins got up to answer it. As he was doing so, Alexander opened the door and came inside the house. Diggins asked him what was going on and Alexander replied, "you know what this is." Tr. p. 114, 116. Alexander then asked where the money was, and he held a black revolver to Diggins's head. He forced Diggins into the living room as Diggins tried to hold him back.

---

[1] Ind. Code § 35-41-5-1; Ind. Code § 35-42-5-1(1).

[4] Smith was sitting in the living room near the front door, and as he stood up, he could see Diggins and Alexander fighting and that Alexander was holding a black revolver to Diggins's face. Alexander pointed the gun at Smith and told him to sit down. The fight moved across the dining room and into the girls' bedroom, where the fight continued on their bed. The girls were awake and screaming. The men then moved through the bathroom into Diggins's bedroom. Throughout the fight, Diggins continued to ask Alexander what he was doing, and Alexander kept asking where the money was.

[5] At that time, Smith heard a gunshot and exited the house through the back door. He ran to his truck, drove two blocks to his house, called 911, and drove back to Diggins's house, at which time the police were approaching the door. After the shot, Alexander ran out of the house through the front door. Diggins checked on his kids and called the police. Diggins allowed the police to search his house. The police did not find any evidence of a gunshot or of a bullet.

[6] On September 29, 2014, the State charged Alexander with attempted robbery, a Level 3 felony. On November 16-18, 2015, a jury trial took place. During the trial, after Diggins testified, the State noticed that a juror was falling asleep in the back row and asked whether the jury could take a second to stand up and stretch. The trial court stated that it did not want to do that because they had just taken a break. After Detective Bayne Bennett testified, the trial court observed that Juror Number Three was knitting and that Juror Number Twelve was unable to stay awake, at least through Detective Bennett's testimony. The State said that Juror Number Twelve slept through the last witness and that she

might need to be removed. The trial court stated that it had misunderstood the State's earlier comment about a sleeping juror, thinking that the State had said a juror appeared sleepy. The trial court and counsel for both sides agreed that the sleeping juror could not remain on the jury.

[7]     As for the knitting juror, the trial court stated, "I think she's listening too. I think she's—like just she needs to have her hands active while she's listening but . . . I haven't noticed that she's not paying attention, I'll say that. I have noticed that she is paying attention." *Id.* at 214. The trial court then stated, "So maybe she can, you know, listen and do that with her hands but I will tomorrow, either myself or through my trusted bailiff, have her advised that she cannot bring anything like that into the courtroom." *Id.* Shortly thereafter, when the proceeding concluded for the day, the trial court excused the sleeping juror from jury service and stated that it would replace her with the one alternate juror. The trial court then took an overnight recess.

[8]     The next day, the trial court stated that, after the previous day's proceeding had ended, Juror Number One had advised the court that she recognized Diggins when he testified as a relative of the father of her child, which she had indicated was a possibility during jury selection, and that she recognized people sitting in the courtroom gallery. The trial court also stated that Juror Number Seven had said that she recognized people in the courtroom gallery.

[9]     The trial court called in Juror Number One and asked her whether, based upon her knowledge of who Diggins was and the fact that she knew some people in

the gallery, she could still judge the evidence fairly and impartially. Juror Number One stated, "I do. I mean I feel like I can judge it, you know, fairly." *Id.* at 223. The trial court asked her whether it caused her any concern that she knew anybody, and she stated, "Just a little uncomfortable, not just really concern about my well-being . . . but just concerned a little." *Id.* The trial court then asked whether she thought she could continue serving on the jury and fulfill her obligations as a juror, and she said yes. Defense counsel asked Juror Number One what her concerns were, and she replied, "I mean just because we in [sic] the same neighborhood. . . . I mean I'm not related to them but my son's father is." *Id.* at 224. Juror Number One also said that she had not spoken to Diggins personally. She said that she did not know the people she recognized in the gallery. Defense counsel then asked, "And with all of the stuff that we talked about before, you're okay with all of the instructions and what your duties as a juror are?" *Id.* at 225. Juror Number One replied, "Yeah, I understand everything." *Id.*

[10] Next, the trial court called in Juror Number Seven, who said that she thought she recognized Skylar Diggins's father because he was frequently on television. The trial court asked her whether it caused her any concern in continuing her duties as a juror, and she replied, "No. We're not even acquaintances." *Id.* at 229. Counsel did not ask any questions.

[11] The trial court then said it would call in Juror Number Three to tell her to stop knitting during the trial. Before the juror entered the room, the trial court said that "as long as she feels that she heard everything and was able to pay

attention to everything, I don't see a big problem with the fact that she was knitting yesterday unless it did cause a distraction." *Id.* at 230. Defense counsel agreed. Juror Number Three stated that she does not have to look at her knitting while she knits and that she was able to hear and pay attention to all of the evidence. The trial court asked her to not knit in court, and the juror herself agreed that it was a distraction. Counsel did not ask any questions.

[12] After the trial court excused Juror Number Three, it asked the parties whether they wanted to make any record about any of the three jurors. The parties agreed that Juror Number Three had paid attention during the proceeding and made no comments about the other jurors. The trial court asked whether everyone was comfortable with proceeding with the twelve jurors; both sides replied affirmatively.

[13] Alexander then testified. Defense counsel asked him whether he had ever been convicted of a crime. Alexander testified that he had previously pleaded guilty to bank robbery. On cross-examination, the State asked Alexander whether he had previous convictions for armed robbery with a deadly weapon and bank robbery with a deadly weapon. Alexander answered that there were two counts. The State asked, "Two different events, isn't it?" *Id.* at 259. Alexander replied, "I believe so." *Id.* The following exchange then took place:

> Q: Okay. But you don't deal drugs because you'd get in trouble
>    for that, right?
>
> A: I used to sell drugs.

Q: Okay. You just don't sell them anymore?

A: Not anymore, no.

Q: Because you're on federal parole, right? So if you did that, that would violate your federal parole?

A: Yeah, I am on probation, yes.

Q: So you were on probation on the night that this happened too, right?

A: Yes.

Q: So if you got convicted of this crime, that would violate your federal parole as well?

[14] *Id.* at 259-60. In a private sidebar, defense counsel objected based on relevance. The State contended that its questions went to Alexander's bias and interest in the case. The trial court agreed with the State, stating that the question "provides a basis for his reason to perhaps fabricate testimony." *Id.* at 260. The trial court then stated, "But we've asked the question. We're going to move on and we don't get to get into anything more about the convictions now." *Id.* at 261.

[15] Following the trial, the jury found Alexander guilty as charged. On December 15, 2015, the trial court sentenced him to sixteen years incarceration. He now appeals.

## Discussion and Decision

Alexander argues that the trial court erred when it allowed the State to impeach him on his prior offenses and that it committed fundamental error by not disqualifying three jurors.

## I. Impeachment

Alexander first argues that he was impeached with evidence of his parole status at the time of the charged offense, and that this impeachment violated multiple Indiana Rules of Evidence, including 401, 403, and 616.[2]

A trial court has broad leeway regarding the admission of evidence. *Smith v. State*, 889 N.E.2d 836, 839 (Ind. Ct. App. 2008). We will reverse only if the decision is clearly against the logic and effect of the facts before the trial court. *Figures v. State*, 920 N.E.2d 267, 271 (Ind. Ct. App. 2010).

The rules governing the relevance and admission of evidence are well settled. In *Konopasek v. State*, our Supreme Court wrote:

> Indiana Evidence Rule 401 provides a liberal standard for relevancy, and we review a trial court's ruling on relevance for an abuse of discretion. *Id.* Relevant evidence is "evidence having

---

[2] Alexander also argues that the admission of evidence violated Rule 609. He did not make a Rule 609 objection at trial and therefore waives this argument on appeal. In any event, there was no Rule 609 violation.

Additionally, Alexander claims that the evidence was inadmissible under Rule 404(b), which controls the use of character evidence, or, in the alternative, that the improper use of character evidence constitutes a fundamental error. We find that he has waived such arguments for failure to adequately present the issues and support his arguments with cogent reasoning and citations to authority. Ind. Appellate Rule 46(A)(8)(a).

any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Indiana Evidence Rule 616 explicitly makes "evidence of bias, prejudice, or interest of the witness for or against any party" relevant and admissible for impeachment purposes, as this evidence can impact the weight of the witness's testimony. *See Dorsey v. State*, 802 N.E.2d 991, 993 (Ind. Ct. App. 2004). However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [.]" Evid. R. 403.

946 N.E.2d 23, 27-28 (Ind. 2011).

[20] On direct examination, Alexander testified that he had previously pleaded guilty to bank robbery. By being up front about a former conviction, Alexander "wanted to leave the impression that he was an honest individual." *Id.* at 28. The State's inquiry into the number of his convictions and his parole status served to show that, because another conviction could have had an impact on his parole status, he had an interest to falsify his testimony and deny any involvement in the instant offense. This was "a classic 'he said-he said' case and evidence impeaching [Alexander] was significantly relevant." *Id.*

[21] Further, we find that the probative value of the evidence was not substantially outweighed by unfair prejudice. "In cases where trial testimonies are the bulk of the evidence, credibility is a key factor. As a result, impeachment evidence can be highly probative." *Id*. As the parolee, Alexander understood he faced significant jail time if convicted of this offense and thus had an interest in lying. Moreover, this testimony was not unfairly prejudicial. The testimony was brief;

the State's question—"So if you got convicted of this crime, that would violate your federal parole as well?"—was never answered by Alexander; and the trial court did not allow any other questions on Alexander's prior convictions or parole status. Tr. p. 260-61. In short, we find no error in the admission of this evidence.

## II. Jurors

Alexander next argues that the trial court committed fundamental error by not disqualifying three jurors. His argument of bias rests on the fact that Juror Number One was concerned that she recognized Diggins as a relative of her son's father and that Juror Number Seven was concerned that she was familiar with the Diggins family.[3] Because Alexander did not object to the trial court's decision to retain these jurors, he must establish fundamental error to prevail, meaning that he must show that the trial court erred by not sua sponte raising the issue because the alleged error was a blatant violation of due process and presented an undeniable and substantial potential for harm. *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014). Fundamental error will be found only in egregious circumstances. *Id.*

A defendant has a right to an impartial jury; therefore, a biased juror must be dismissed. Ind. Const. art. I, § 13; *Harris v. State*, 659 N.E.2d 522, 525 (Ind.

---

[3] Alexander does not make a specific argument as to why the knitting juror should have been disqualified. Therefore, we summarily affirm the trial court with respect to this juror.

1995). Determining whether to excuse a juror for bias rests within the sound discretion of the trial court. *Wisehart v. State*, 693 N.E.2d 23, 55 (Ind. 1998). We will sustain the trial court's decision unless it is illogical or arbitrary. *Id.* "A juror's bias may be actual or implied, but a court must remove a juror for implied bias—that is, regardless of actual bias—only where a relationship exists between the juror and one of the parties." *Caruthers v. State*, 926 N.E.2d 1016, 1020 (Ind. 2010). The trial court must weigh the nature and extent of the relationship versus the ability of the juror to remain impartial. *McCants v. State*, 686 N.E.2d 1281, 1284-85 (Ind. 1997).

[24] Initially, we note that not only did Alexander's counsel not object to the trial court's decision, his counsel agreed with the trial court that the jurors were able to appropriately perform their duties. At most, therefore, any error was invited error, not fundamental error. *See Witte v. Mundy ex. rel. Mundy*, 820 N.E.2d 128, 133 (Ind. 2005) (holding that a party may not take advantage of an error that he invites).

[25] Waiver and invited error notwithstanding, we find that the trial court properly left these jurors on the panel. We note that, after Juror Number One and Juror Number Seven each expressed concerns, the trial court conducted additional voir dire with counsel present. The purpose of voir dire is to determine whether a prospective juror can render a fair and impartial verdict in accordance with the law and the evidence. *Joyner v. State*, 736 N.E.2d 232, 237 (Ind. 2000). During the additional voir dire, Juror Number One said that she did not actually know the parties or the people in the gallery whom she recognized, and

she twice affirmed her ability to judge the trial fairly and impartially. Similarly, when the trial court asked Juror Number Seven whether she had any concerns in fulfilling her duties as a juror because she recognized someone in the courtroom, she replied, "No. We're not even acquaintances." Tr. p. 229. During each additional voir dire, defense counsel had the opportunity to ask the jurors questions. After, the trial court asked whether either side wanted to make any record about any of the three jurors; defense counsel did not make any comments. Thus, the trial court properly determined that neither juror was biased and each was able to proceed as a fair and impartial juror. For these reasons, we cannot say that the trial court committed fundamental error—or any error—in not disqualifying these three jurors.

[26] The judgment of the trial court is affirmed.

May, J., and Brown, J., concur.